## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

UNITED STATES OF AMERICA,

v.                                        Case No. 3:07cr114/LAC

JUSTIN ERIC KING,

Defendant.

_____/

## COURT'S INSTRUCTIONS
## TO THE JURY

Members of the Jury:

It is now my duty to instruct you on the rules of law that you must follow

and apply in deciding this case.  When I have finished you will go into the jury

room and begin your discussions – what we call your deliberations.

It will be your duty to decide whether the Government has proved beyond

a reasonable doubt the specific facts necessary to find the Defendant guilty of

the crimes charged in the indictment.

FILED IN OPEN COURT THIS
12/3/07
CLERK, U. S. DISTRICT
COURT, NORTH DIST. FLA.

You must make your decision only on the basis of the testimony and other evidence presented here during the trial; and you must not be influenced in any way by either sympathy or prejudice for or against the Defendant or the Government.

You must follow the law as I explain it to you whether you agree with that law or not; and you must follow all of my instructions as a whole. You may not single out, or disregard, any of the Court's instructions on the law.

The indictment or formal charge against any Defendant is not evidence of guilt. Indeed, the Defendant is presumed by the law to be innocent. The law does not require the Defendant to prove his or her innocence or produce any evidence at all; and if a Defendant elects not to testify, you should not consider that in any way during your deliberations. The Government has the burden of proving the Defendant guilty beyond a reasonable doubt, and if it fails to do so you must find the Defendant not guilty.

2

Thus, while the Government's burden of proof is a strict or heavy burden, it is not necessary that the Defendant's guilt be proved beyond all possible doubt. It is only required that the Government's proof exclude any "reasonable doubt" concerning the Defendant's guilt.

A "reasonable doubt" is a real doubt, based upon reason and common sense after careful and impartial consideration of all the evidence in the case.

Proof beyond a reasonable doubt, therefore, is proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs. If you are convinced that the Defendant has been proved guilty beyond a reasonable doubt, say so. If you are not convinced, say so.

3

As stated earlier you must consider only the evidence that has been admitted in the case. The term "evidence" includes the testimony of the witnesses and the exhibits admitted in the record. Remember that anything the lawyers say is not evidence in the case. It is your own recollection and interpretation of the evidence that controls. What the lawyers say is not binding upon you. Also, you should not assume from anything I may have said that I have any opinion concerning any of the issues in this case. Except for my instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own decision concerning the facts.

In considering the evidence you may make deductions and reach conclusions which reason and common sense lead you to make; and you should not be concerned about whether the evidence is direct or circumstantial. "Direct evidence" is the testimony of one who asserts actual knowledge of a fact, such as an eye witness. "Circumstantial evidence" is proof of a chain of facts and circumstances tending to prove, or disprove, any fact in dispute. The law makes no distinction between the weight you may give to either direct or circumstantial evidence.

4

Now, in saying that you must <u>consider</u> all of the evidence, I do not mean that you must <u>accept</u> all of the evidence as true or accurate. You should decide whether you believe what each witness had to say, and how important that testimony was. In making that decision you may believe or disbelieve any witness, in whole or in part. Also, the number of witnesses testifying concerning any particular dispute is not controlling.

In deciding whether you believe or do not believe any witness, I suggest that you ask yourself a few questions:

–       Did the person impress you as one who was telling the truth?

–       Did he or she have any particular reason not to tell the truth?

–       Did he or she have a personal interest in the outcome of the case?

–       Did the witness seem to have a good memory?

–       Did the witness have the opportunity and ability to observe accurately the things he or she testified about?

–       Did the witness appear to understand the questions clearly and answer them directly?

–       Did the witness's testimony differ from the testimony of other witnesses?

5

You should ask yourself whether there was evidence tending to prove that the witness testified falsely concerning some important fact; or, whether there was evidence that at some other time the witness said or did something, or failed to say or do something, which was different from the testimony he or she gave before you during the trial.

The fact that a witness has been convicted of a felony offense, or a crime involving dishonesty or false statement, is another factor you may consider in deciding whether you believe that witness.

You should keep in mind, of course, that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth as he or she remembers it, because people naturally tend to forget some things or remember other things inaccurately. So, if a witness has made a misstatement, you need to consider whether that misstatement was simply an innocent lapse of memory or an intentional falsehood; and the significance of that may depend on whether it has to do with an important fact or with only an unimportant detail.

6

The testimony of some witnesses must be considered with more caution than the testimony of other witnesses.

In this case the Government called as witnesses persons named as co-Defendants in the indictment with whom the Government has entered into plea agreements providing for the possibility of a lesser sentence than the witnesses would otherwise be exposed to for the offenses to which they plead guilty. Such plea bargaining, as it is called, has been approved as lawful and proper, and is expressly provided for in the rules of this Court. However, a witness who hopes to gain more favorable treatment in his or her own case, or hopes not to be prosecuted at all, may have a reason to make a false statement because he wants to strike a good bargain with the Government.

And, of course, the fact that a witness has plead guilty to the crime charged in the indictment is not evidence, in and of itself, of the guilt of any other person.

So, while these kinds of witnesses may be entirely truthful when testifying, you should consider their testimony with more caution than the testimony of other witnesses.

7

When the Government offers testimony or evidence that a Defendant made a statement or admission to someone, after being arrested or detained, the jury should consider the evidence concerning such a statement with caution and great care.

It is for you to decide (1) whether the Defendant made the statement and (2) if so, how much weight to give to it. In making these decisions you should consider all of the evidence about the statement, including the circumstances under which the Defendant may have made it.

8

Now, I would like to take up the specific charges set out in the indictment

in this case. Please remember, as I have already told you, that the indictment is

not part of the evidence in this case. It is merely an accusation, and you must

not draw any inference of guilt from it.

In this case, the indictment charges seven separate offenses against the

Defendant which we will call "counts."

In summary, Count One charges that the Defendant knowingly conspired

with his co-defendants and with other persons to make false statements on

immigration documents or to knowingly present such documents containing

false statements.

Counts Seven through Eleven charges that the Defendant knowingly made

false statements on immigration documents or knowingly presented such

documents containing false statements.

Count Twelve charges that the Defendant, for commercial advantage or

private financial gain, knowingly conspired with other persons to induce aliens

to illegally enter the United States.

9

I will explain the law governing the substantive offenses in a moment. First, however, as to Counts One and Twelve, you will note that the Defendant is not charged with actually make false statements on immigration documents or with inducing aliens to illegally enter the United States. Rather, he is charged with conspiring to do so in violation of federal law.

10

Title 18, United States Code, Section 371, makes it a separate Federal crime or offense for anyone to conspire or agree with someone else to do something which, if actually carried out, would amount to another Federal crime or offense. So, under this law, a "conspiracy" is an agreement or a kind of "partnership" in criminal purposes in which each member becomes the agent or partner of every other member.

In order to establish a conspiracy offense it is <u>not</u> necessary for the Government to prove that all of the people named in the indictment were members of the scheme; <u>or</u> that those who <u>were</u> members had entered into any formal type of agreement; <u>or</u> that the members had planned together <u>all</u> of the details of the scheme or the "overt acts" that the indictment charges would be carried out in an effort to commit the intended crime.

Also, because the essence of a conspiracy offense is the making of the agreement itself (followed by the commission of any overt act), it is not necessary for the Government to prove that the conspirators actually succeeded in accomplishing their unlawful plan.

11

What the evidence in the case <u>must</u> show beyond a reasonable doubt is:

<u>First</u>:       That two or more persons, in some way or manner, came to a mutual understanding to try to accomplish a common and unlawful plan, as charged in the indictment;

<u>Second</u>:    That the Defendant, knowing the unlawful purpose of the plan, willfully joined in it;

<u>Third</u>:      That one of the conspirators during the existence of the conspiracy knowingly committed at least one of the methods (or "overt acts") described in the indictment; and

<u>Fourth</u>:   That such "overt act" was knowingly committed at or about the time alleged in an effort to carry out or accomplish some object of the conspiracy.

An "overt act" is any transaction or event, even one which may be entirely innocent when considered alone, but which is knowingly committed by a conspirator in an effort to accomplish some object of the conspiracy.

12

A person may become a member of a conspiracy without knowing all of the details of the unlawful scheme, and without knowing who all of the other members are. So, if a Defendant has a general understanding of the unlawful purpose of a plan and knowingly and willfully joins in that plan on one occasion, that is sufficient to convict him or her for conspiracy even though he or she did not participate before, and even though he or she played only a minor part.

Of course, mere presence at the scene of a transaction or event, or the mere fact that certain persons may have associated with each other, and may have assembled together and discussed common aims and interests, does not necessarily establish proof of a conspiracy. Also, a person who has no knowledge of a conspiracy, but who happens to act in a way which advances some purpose of one, does not thereby become a conspirator.

13

As it concerns the crime underlying the conspiracy charge in Count One, and as it concerns Counts Seven through Eleven, Title 18, United States Code, Section 1546, makes it a Federal crime or offense for anyone to knowingly subscribe as true false statements on an immigration document or to present such a document knowing that it contains any such false statement.

The Defendant can be found guilty of that offense only if all of the following facts are proved beyond a reasonable doubt:

First:    That the Defendant knowingly made a statement under oath, in an application, affidavit, or other document, **OR** the Defendant knowingly presented an application, affidavit, or other document which contained such statement;

Second:    That the statement was false;

Third:    That the false statement related to a material fact in such application, affidavit, or other document;

Fourth:    That in so doing the Defendant acted willfully and with knowledge that such statement was false; and

14

Fifth:          That the false statement was
made or presented in a form
required by the immigration
laws and regulations, that is, a
Form ETA-750 and its
attachments and/or a Form I-
129 and its attachments.

A statement is "false" if it was untrue when made or presented and was then known to be untrue by the person making or presenting it.

A false statement is "material" if it has a natural tendency to affect or influence, or is capable of affecting or influencing, the decision of the decision maker to which it is addressed. The test is whether the false statement has the capacity to impair or pervert the functioning of the decision maker. In other words, a misrepresentation is material if it relates to an important fact as distinguished from some unimportant or trivial detail.

15

As it concerns the crime underlying the conspiracy charge in Count Twelve, Title 8, United States Code, Section 1324(a)(1)(A)(iv), makes it a Federal crime or offense for anyone to induce or encourage an alien to enter the United States, knowing that such entry would be illegal.

The Defendant can be found guilty of that offense only if all of the following facts are proved beyond a reasonable doubt:

First:     That the Defendant encouraged or induced
           an alien to come to, enter, or reside in the
           United States in violation of the law; and

Second:    That the Defendant knew, or acted with
           reckless disregard of the fact, that such
           coming to, entering or residing in the
           United States would be in violation of the
           law; and

An alien is any person who is not a natural-born or naturalized citizen, or a national of the United States. The term "national of the United States" includes not only a citizen, but also a person who, though not a citizen of the United States, owes permanent allegiance to the United States.

To act with "reckless disregard" means to be aware of, but consciously and carelessly ignore, facts and circumstances clearly indicating that the alien's coming to, entry into or residence in the United States would be in violation of the law.

16

In some instances a conspirator may be held responsible under the law for

a substantive offense in which he or she had no direct or personal participation

if such offense was committed by other members of the conspiracy during the

course of such conspiracy and in furtherance of its objects.

So, in this case, with regard to Counts Seven through Eleven, and insofar

as the Defendant is concerned, if you have first found the Defendant guilty of

the conspiracy offense as charged in Count One of the indictment, you may also

find the Defendant guilty of the any of the offenses charged in Counts Seven

through Eleven even though the Defendant did not personally participate in such

offense if you find, beyond a reasonable doubt:

- First: That any offense charged in Counts Seven through Eleven was committed by a conspirator during the existence of the conspiracy and in furtherance of its objects;

- Second: That the Defendant under consideration was a knowing and willful member of the conspiracy at the time of the commission of such offense; and

- Third: That the commission of such offense by a co-conspirator was a reasonably foreseeable consequence of the conspiracy.

17

You will note that the indictment charges that the offenses were committed "on or about" or "from on or about" a certain date. The Government does not have to prove with certainty the exact date of the alleged offense. It is sufficient if the Government proves beyond a reasonable doubt that the offense was committed on a date reasonably near the date alleged.

The word "knowingly," as that term is used in the indictment or in these instructions, means that the act was done voluntarily and intentionally and not because of mistake or accident.

The word "willfully," as that term is used in the indictment or in these instructions, means that the act was committed voluntarily and purposely, with the specific intent to do something that the law forbids; that is, with bad purpose either to disobey or disregard the law.

18

A separate crime or offense is charged in each count of the indictment. Each charge and the evidence pertaining to it should be considered separately. The fact that you may find the Defendant guilty or not guilty as to one of the offenses charged should not affect your verdict as to any other offense charged.

I caution you, members of the Jury, that you are here to determine from the evidence in this case whether the Defendant is guilty or not guilty. The Defendant is on trial only for those specific offenses alleged in the indictment.

Also, the question of punishment should never be considered by the jury in any way in deciding the case. If the Defendant is convicted the matter of punishment is for the Judge alone to determine later.

19

Any verdict you reach in the jury room, whether guilty or not guilty, must be unanimous. In other words, to return a verdict you must all agree. Your deliberations will be secret; you will never have to explain your verdict to anyone.

It is your duty as jurors to discuss this case with one another in an effort to reach agreement if you can do so. Each of you must decide the case for yourself, but only after full consideration of the evidence with the other members of the jury. While you are discussing the case do not hesitate to re-examine your own opinion and change your mind if you become convinced that you were wrong. But do not give up your honest beliefs solely because the others think differently or merely to get the case over with.

Remember, that in a very real way you are judges – judges of the facts. Your only interest is to seek the truth from the evidence in the case.

20

When you go to the jury room you should first select one of your members to act as your foreperson. The foreperson will preside over your deliberations and will speak for you here in court.

A form of verdict has been prepared for your convenience.

## [Explain verdict form]

You will take the verdict form to the jury room, and when you have reached unanimous agreement you will have your foreperson fill in the verdict form, date and sign it, and notify the marshal that you have reached a verdict. I will then have you return to the courtroom in order for us to receive your verdict.

If you should desire to communicate with me at any time, please write down your message or question and pass the note to the marshal, who will bring it to my attention. I will then respond as promptly as possible, either in writing or by having you returned to the courtroom so that I can address you orally. I caution you, however, with regard to any message or question you might send, that you should <u>not</u> tell me your numerical division at the time.

21

Case 3:07-cr-00114-LC Document 114 Filed 12/03/07 Page 22 of 41

United States District Court
Northern District of Florida                    **JURY COMMUNICATION**  12/3/07

1. Need specific exhibit #'s for counts
   9,10,11 — ie: e-mails/ad proofs/proof of ad
   payments.

you have been provided all of the
exhibits that were admitted in the case
for your consideration.

S a Collier
Judge

Juror Communication #1
FILED IN OPEN COURT THIS
12/3/17
COURT, NORTH DIST. FLA.

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

**UNITED STATES OF AMERICA**

**SEALED**

v.

**INDICTMENT**

3:07cr 114/LAC

**ALEKSANDER V. BERMAN,**
a/k/a "Alex Berman,"
**JUSTIN ERIC KING,**
**and**
**VYACHESLAVE ADOL'FOVICH FINKEL,**
a/k/a "Stan Finkel,"
a/k/a "Slava Finkel"

**THE GRAND JURY CHARGES:**

### COUNT ONE

### A. INTRODUCTION

1.      Eurohouse Holding Corp. ("Eurohouse") was an organization incorporated

in the State of Georgia on or about December 6, 1999 and registered in the State of

Florida on or about April 22, 2002. Eurohouse was located at 1887 Shalimar Drive, N.E.,

Atlanta, Georgia, 419 Anderson Drive, Destin, Florida and 65 Paginet Way, Destin,

Florida. The listed purpose for Eurohouse was janitorial services.

2.      Woland, Inc. ("Woland") was an organization incorporated in the State of

Georgia on or about March 31, 2006 and registered in the State of Florida on or about

August 24, 2006. Woland was located at 1977 Clairmont Terrace, N.E., Atlanta, Georgia

OFFICE OF CLERK
U.S. DISTRICT CT.
NORTHERN DIST. FLA.
PENSACOLA FLA.

07 SEP 18 AM 11:27

Returned in open court pursuant to Rule 6(f)

9-18-2007
Date

United States Magistrate Judge

and 50 Garnet Bayou Road, Santa Rosa Beach, Florida. The listed purpose for Woland was hotel support services.

3.      Defendant **ALEKSANDER V. BERMAN, a/k/a "Alex Berman,"** (hereinafter referred to as **BERMAN**) was the chief financial officer of Eurohouse and was a fifty (50) percent shareholder of Woland.

4.      Defendant **JUSTIN ERIC KING** (herein after referred to as **KING**) was an officer of Eurohouse and was an employee of Woland.

5.      Defendant **VYACHESLAVE ADOL'FOVICH, a/k/a "Stan Finkel,"** **a/k/a "Slava Finkel,"** (herein after referred to as **FINKEL**) was an employee of Eurohouse.

6.      Under United States laws and regulations, non-citizens of the United States ("aliens") are not permitted to work in the United States unless they obtain employment authorization from the United States Government.

7.      Aliens living outside of the United States can apply for a non-immigrant visa referred to as an H-2B visa. The H-2B visa permits aliens to work in the United States for a specified, temporary period of time.

8.      An employer seeking to employ temporary foreign employees was required to use a process involving at least three steps and at least three government entities: a state labor agency, the United States Department of Labor ("DOL"), and the United States Department of Homeland Security, Citizenship and Immigration Services ("CIS").

2

9.      The state labor agency in Florida is the Agency for Workforce Innovation ("AWI").

10.     The state labor agency in Louisiana is Louisiana Works, Office of Workforce Development.

11.     A prospective employer is required to file a DOL Application for Alien Employment Certification ("ETA-750") with the state labor agency, for example, AWI. The application sets forth the name of the employer, the address of the employer and where the aliens will work, the job being offered, the rate of pay, the qualifications required of the prospective alien employee, the number of openings to be filled by aliens and dates of expected employment.  The employer must also describe in detail efforts to recruit qualified United States workers for the job opportunity and the results of those efforts. The ETA-750 application must be completed and signed under penalty of perjury by the prospective employer.  The state labor agency reviews the ETA-750 for completeness, ensures that the employer is offering the prevailing wage for the job listed in the ETA-750, and oversees any advertising the employer might be required to do as part of the labor certification process.

12.     After the ETA-750 is reviewed by the state labor agency, it is forwarded to DOL for consideration and certification.  If DOL certifies the ETA-750, then DOL issues the certified ETA-750 with an original stamped certification that contains the signature of the certifying DOL officer.  The DOL officer also issues the prospective employer a "Final Determination Letter," which notifies the employer that the request for temporary

3

foreign workers has been certified based upon the ETA-750 and the supporting documentation.

13.     Once DOL issues the prospective employer a certified ETA-750, the employer is required to submit the original ETA-750, along with a Petition for Nonimmigrant Worker ("I-129") to CIS.  The I-129 petition must be completed and signed under penalty of perjury by the prospective employer.  In the I-129 petition, the employer represents that there is a specific job to fill and describes the nature, location, terms, and requirements of the job.

14.     If CIS approves the I-129 petition, a CIS employee notes the approval on the original I-129 petition, and designates the number of H-2B temporary foreign worker positions approved on the I-129.  The prospective employer is notified by letter that the I-129 petition has been approved.  If CIS approves the I-129 petition, CIS generates a Notice of Action ("I-797") and a copy is sent to the employer and the appropriate United States Embassy.

15.     Aliens seeking to enter the United States as an H-2B temporary worker are required to complete an Application for a Nonimmigrant Visa ("DS-156").  The alien must submit the DS-156 form to the United States Embassy or United States Consulate in the country from which they are applying.

16.     Once the appropriate United States Embassy or Consulate receives the approved I-797 from CIS, the United States Department of State issues H-2B visas to qualified aliens.

4

17.    Once an alien receives an H-2B visa, the alien is permitted to apply for

entry into the United States and work for the petitioning employer.

## B. CHARGE

That from on or about April 22, 2002, through the date of the return of this

Indictment, in the Northern District of Florida and elsewhere, the defendants,

**ALEKSANDER V. BERMAN,**
**a/k/a "Alex Berman,"**
**JUSTIN ERIC KING,**
**and**
**VYACHESLAVE ADOL'FOVICH FINKEL,**
**a/k/a "Stan Finkel,"**
**a/k/a "Slava Finkel,"**

did knowingly combine, conspire, confederate and agree together and with other persons,

known and unknown, to make under oath, and as permitted under penalty of perjury

under Section 1746 of Title 28, United States Code, and to knowingly subscribe as true,

false statements with respect to a material fact in applications, affidavits and other

documents required by the immigration laws and regulations prescribed thereunder, and

to knowingly present such applications, affidavits and other documents containing false

statements, in violation of Title 18, United States Code, Section 1546(a).

## C. MANNER AND MEANS BY WHICH THE
## CONSPIRACY WAS CARRIED OUT

1.    The purpose of the conspiracy was for the defendants and others to

unjustly enrich themselves by preparing and submitting fraudulent ETA-750 applications,

fraudulent I-129 petitions, and related applications to the United States Government.

5

2.      The defendants and others prepared fraudulent ETA-750 applications using the names and addresses of hotels and resorts located in the Northern District of Florida and elsewhere. In these ETA-750 applications, the defendants and others requested a certain number of "unnamed" foreign workers to work at specific hotels and specified the type of job being offered, the hourly rate of pay for the job, and the qualifications that the hotels required of the prospective alien employees.

3.      The defendants and others submitted the ETA-750 applications to the state labor agency. In the submitted ETA-750 applications, one or more of the co-conspirators posed as the president and an authorized representative of various hotels including, but not limited to the following: (1) Ramada Inn - Destin; (2) Hilton Sandestin Beach Golf Resort and Spa; (3) Embassy Suites Hotel, Destin - Miramar Beach; and (4) Bay Point Marriott Resort Golf and Yacht Club.

4.      These ETA-750 applications were fraudulent and contained falsehoods, including (1) forged signatures and declarations, (2) false assertions that the defendants and others represented the hotels listed in the applications, and (3) false statements about the jobs listed in the applications.

5.      It was further part of the conspiracy that the defendants and others created letters on the hotels' letterhead without authorization from the hotels. The letters contained falsehoods, including the hotels' need to hire temporary workers as housekeepers during the seasonal tourist season. The letters contained the signature block and signature of one or more of the co-conspirators and forged signatures of persons

6

purporting to be authorized representatives of each the hotels. The letters were submitted to the state labor agency as supporting documentation to the ETA-750.

6.    It was further part of the conspiracy that the defendants and others placed advertisements for housekeeping jobs in newspapers. The state labor agency and the DOL require employers to attempt to find qualified United States workers to fill vacant jobs before certifying foreign workers.

7.    It was further part of the conspiracy that after the DOL certified the ETA-750 applications, the defendants and others prepared and submitted I-129 petitions to CIS. These I-129 petitions were based upon the fraudulently obtained DOL labor certifications. The I-129 petitions submitted to CIS contained falsehoods, including false assertions that the defendants and others represented the hotels listed in the petitions.

8.    Following the approval of the I-129 petitions by CIS, aliens came to the United States and worked for various hotels as Eurohouse contract employees based on non-immigrant visa applications that were not authorized by any hotel.

### D. OVERT ACTS

1.    On or about April 22, 2002, Eurohouse was registered in the State of Florida.

2.    In or about the summer of 2003, **BERMAN** and Anna Shaulova Czerwien went to the Hilton Sandestin in Destin, Florida and solicited hotel management to hire Eurohouse as a labor contractor to provide cleaning services for the hotel. **BERMAN** and Anna Shaulova Czerwien falsely purported that they had a legal workforce that could

7

be provided to the hotel.

3.      On or about June 24, 2003, **BERMAN** signed a service agreement with

Enterprise HR on behalf of Eurohouse. Enterprise HR provided employee payroll

services for Eurohouse.

4.      On or about December 11, 2003, Anna Shaulova Czerwien signed and

caused to be submitted an ETA-750 application requesting certification for eight (8)

H-2B foreign workers to be employed at the Ramada Inn, Destin, Florida.

5.      On or about December 11, 2003, Anna Shaulova Czerwien signed a letter

as purported president of the Ramada Inn on Ramada Inn letterhead which letter was

included as an attachment with the ETA-750 described in paragraph 4.

6.      On or about February 27, 2004, Anna Shaulova Czerwien signed and

caused to be submitted an I-129 petition requesting eight (8) H-2B visas for unnamed

recipients located in Romania. Thereafter, CIS approved the I-129 petition and the

petition was assigned SRC # 04-105-50028. Subsequently, the United States Embassy in

Bucharest, Romania, issued H-2B visas to six (6) Romanian nationals.

7.      In or about 2004 and 2005, **BERMAN** and **KING** went to the Ramada

Inn, Destin, Florida, and solicited management to hire Eurohouse workers. **BERMAN**

and **KING** falsely purported that they had a legal workforce that could be provided to the

hotel.

8.      On or about December 11, 2003, Anna Shaulova Czerwien signed and

caused to be submitted two ETA-750 applications requesting certification for H-2B

8

foreign workers to be employed at the Hilton Sandestin, Destin, Florida. One ETA-750 application requested certification for thirty-two (32) H-2B foreign workers and the other ETA-750 application requested certification for eighty-eight (88) H-2B foreign workers.

9.      On or about December 11, 2003, Anna Shaulova Czerwien signed a letter as purported president of the Hilton Sandestin on Hilton Sandestin letterhead. This letter was included as an attachment with the ETA-750 applications described in paragraph 8.

10.     On or about February 19, 2004, Anna Shaulova Czerwien signed and caused to be submitted an I-129 petition in follow up with the ETA-750 described in paragraph 8, requesting thirty-two (32) H-2B temporary workers and requesting thirty-two (32) H-2B visas for unnamed recipients located in Romania. Thereafter, CIS approved the I-129 petition and the petition was assigned SRC # 04-099-52759. Subsequently, the United States Embassy in Bucharest, Romania issued H-2B visas to thirty-two (32) Romanian nationals.

11.     On or about February 27, 2004, Anna Shaulova Czerwien signed and caused to be submitted an I-129 petition in follow up with the ETA-750 described in paragraph 8, requesting eighty-eight (88) H-2B temporary workers and requesting sixty-two (62) H-2B visas for unnamed recipients located in Romania. Thereafter, CIS approved the I-129 petition and the petition was assigned SRC # 04-105-51263. Subsequently, the United States Embassy in Bucharest, Romania issued H-2B visas to sixty-five (65) Romanian nationals.

9

12. On or about March 3, 2004, Anna Shaulova Czerwien signed and caused to be submitted an I-129 petition in follow up with the ETA-750 described in paragraph 8, requesting eighty-eight (88) temporary workers and requesting twenty-six (26) H-2B visas for unnamed recipients located in Bulgaria. Thereafter, CIS approved the I-129 petition and the petition was assigned SRC # 04-108-50296. Subsequently, the United States Embassy in Sofia, Bulgaria, issued H-2B visas to twenty-six (26) Bulgarian nationals.

13. On or about April 7, 2004, a group of aliens arrived at the Sexton Seafood parking lot in Destin, Florida, and were directed by **FINKEL** to the Oaks Inn, located in Destin, Florida.

14 On or about April 7, 2004, **FINKEL** signed a lease as landlord for the Oaks Inn with S.G. S.G. is a Romanian citizen who entered the United States on an H-2B visa to work at the Hilton Sandestin under SRC # 04-099-52759. **FINKEL** required S.G. to pay a $200 deposit and $250 per month for rent.

15. On or about April 7, 2004, **FINKEL** required several aliens including, M.K. and L.A., to sign housing leases and employment contracts. **FINKEL** threatened the aliens with deportation if they did not sign the new employment contracts that provided a reduced rate of pay compared to the original offers of employment. Both M.K. and L.A. were required by **FINKEL** to pay a $200 deposit, $250 per month for rent and $30 a month for a transportation fee. Both M.K. and L.A., Romanian citizens, entered the United States on H-2B visas issued under SRC # 04-105-51263 to work at the

10

Hilton Sandestin.

16.     From on or about April of 2004 through September of 2004, **FINKEL** transported aliens from their residences to the hotels.

17.     From on or about April of 2004 through September of 2004, **FINKEL** threatened aliens with deportation if they complained about their housing conditions. The aliens were required to live in over-crowded conditions in various locations provided by Eurohouse. The aliens paid between $250 and $350 per month for rent.

18.     On or about June 3, 2004, **BERMAN** signed a contract with the Bay Point Marriott to provide twenty (20) temporary workers.

19.     On or about October 14, 2004, Anna Shaulova Czerwien signed and caused to be submitted an ETA-750 application requesting certification for ninety-five (95) H-2B foreign workers to be employed at the Embassy Suites, Destin-Miramar Beach, Florida.

20.     On or about October 14, 2004, Anna Shaulova Czerwien signed a letter as purported president of the Embassy Suites on Embassy Suites' letterhead which letter was included as an attachment with the ETA-750 application described in paragraph 19.

21.     On or about May 24, 2005, Anna Shaulova Czerwien signed and caused to be submitted an I-129 petition requesting ninety-five (95) H-2B visas for unnamed recipients located in Bulgaria. Thereafter, CIS approved the I-129 petition and the petition was assigned SRC # 05-170-52712. Subsequently, the United States Embassy in Sofia, Bulgaria issued H-2B visas to twenty-eight (28) Bulgarian nationals.

11

22. On or about October 14, 2004, Anna Shaulova Czerwien signed and caused to be submitted an ETA-750 application requesting certification for one hundred ten (110) foreign workers to be employed at the Bay Point Marriott, Panama City Beach, Florida.

23. On or about October 14, 2004, Anna Shaulova Czerwien signed a letter as purported president of the Bay Point Marriott on Bay Point Marriott's letterhead which letter was included as an attachment with the ETA-750 described in paragraph 22.

24. On or about May 24, 2005, Anna Shaulova Czerwin signed and caused to be submitted an I-129 petition requesting one hundred ten (110) H-2B visas for unnamed recipients located in Bulgaria. Thereafter, CIS approved the I-129 petition and the petition was assigned SRC # 05-170-52726. Subsequently, the United States Embassy in Sofia, Bulgaria issued H-2B visas to fifty-one (51) Romanian nationals.

25. From on or about May of 2005 through September of 2005, **KING** hand delivered two (2) ETA-750 petitions and accompanying paperwork containing fraudulent information to AWI in Tallahassee, Florida.

26. On or about July 1, 2005, **FINKEL** transported a number of Bulgarian aliens, including I.I., from a bus stop in Fort Walton Beach, Florida, to the Oaks Inn located in Destin, Florida, where the aliens would reside as directed by Eurohouse. I.I. entered the United States on an H-2B visa issued under SRC # 05-170-52726 to work at the Bay Point Marriott, Panama City Beach, Florida.

12

27.     On or about October 15, 2005, **KING** signed an I-129 petition assigned

number SRC # 06-051-52584 for one (1) alien. This I-129 petition adopted the I-129

petition previously assigned SRC # 05-170-52726. The I-129 petition signed by **KING**

listed the petitioning employer as "Eurohouse DBW Sandestin Golf and Beach Resort."

**KING** also signed a letter, as general manager, dated November 30, 2005, on Eurohouse

letterhead that stated, "...we originally filed an I-129 to bring her to the country under

H2B visa program. She has worked for our company since her arrival." **KING** signed an

additional letter, as general manager, on Eurohouse letterhead addressed to CIS

requesting an extension of an H-2B worker's authorized stay.

28.     On or about December 2, 2005, **KING** mailed and cause to be submitted

the I-129 petition and supporting documents referenced in paragraph 28 from the United

States Post Office located in Miramar Beach, Florida, to CIS located in Mesquite, Texas.

29.     On or about January 10, 2006, **KING** signed a service agreement on behalf

of Eurohouse with RT Destin, LLC, d/b/a/ Embassy Suites, to supply workers for

Embassy Suites.

30.     On or about February 17, 2006, **KING** signed a sworn statement attesting

to the Diplomatic Security Service of the United States Department of State that he had

been the general manager of Eurohouse for approximately one year. **KING** stated that his

responsibilities were to "... maintain all office records, ensure (sic) that the U.S. Visa

Petitions and Labor Documents are filed and ensure (sic) that the contracts for the foreign

service nationals are completed. The foreign service nationals sign employment contracts

13

and are provided transportation and housing while employed at Eurohouse. I also manage

the foreign service employees in day to day operations. I ensure that Our (sic) customers

are satisfied with the service that we provide."

31.     On or about February 17, 2006, **BERMAN** signed a sworn statement

attesting to the Diplomatic Security Service of the United States Department of State that

he had been the regional director of Eurohouse for approximately three (3) years.

**BERMAN** stated that Eurohouse subcontracted with other corporations, such as hotels, to

provide contract management and cleaning services using foreign nationals as temporary

workers who entered the United States on H-2B visas. **BERMAN** said his

responsibilities as regional director of Eurohouse included recruiting potential employees

and managing the employees on a daily basis.

32.     On or about July of 2006, **KING** requested that the hotel management at

Embassy Suites prepare a letter on Embassy Suites' letterhead. **KING** provided Embassy

Suites management with the text that was to be included in the letter.

33.     From on or about March of 2006 through July of 2007, **KING**, initially

representing Eurohouse and later Woland, picked up checks issued by Embassy Suites to

satisfy invoices for workers provided by Eurohouse and Woland. **KING** then deposited

the Embassy Suites checks into various Eurohouse and Woland bank accounts.

34.     On or about June 6, 2006, **BERMAN** signed a Eurohouse check for

workers' compensation insurance coverage. The check was written for $684.00 and paid

to the order of Capricorn Coverage, Inc.

14

35.    On or about February 20, 2007, **BERMAN** signed and caused to be submitted an ETA-750 application requesting certification for ninety (90) H-2B foreign workers to be employed at the Embassy Suites, Destin, Florida. Included as an attachment to the ETA-750 application was a fraudulent service agreement purportedly between Woland and Embassy Suites.

36.    On or about February 20, 2007, **BERMAN** signed and caused to be submitted an ETA-750 application requesting certification for ninety (90) H-2B foreign workers to be employed at the Seascape Resort, Destin, Florida. Included as an attachment to the ETA-750 application was a fraudulent service agreement purportedly between Woland and Seascape Resort.

37.    On or about April of 2002 through August 22, 2007, **FINKEL** stored on his laptop computer the following documents which included, but are not limited to previously submitted ETA-750 applications, I-129 petitions and I-797 forms; various fraudulent documents purportedly from hotels; templets to create letters purportedly from hotels; and logo images for various hotels.

All in violation of Title 18, United States Code, Sections 371 and 1349.

## COUNT TWO THROUGH SIX

The allegations contained in Count One, Sections A, C and D of this Indictment are hereby realleged and incorporated by reference herein.

That on or about the dates listed below, in the Northern District of Florida and elsewhere, the defendants,

15

**ALEKSANDER V. BERMAN,**
**a/k/a "Alex Berman,"**
**and**
**VYACHESLAVE ADOL'FOVICH FINKEL,**
**a/k/a "Stan Finkel,"**
**a/k/a "Slava Finkel,"**

did knowingly make under oath, and as permitted under penalty of perjury under Title 28,

United States Code, Section 1746, and did knowingly subscribe as true, false statements

with respect to a material fact in applications, affidavits and other documents required by

the immigration laws and regulations prescribed thereunder, and did knowingly present

such applications, affidavit and other documents containing false statements, that is:

| Count | Alien Beneficiary | Purported Employer | Position | Date of ETA-750 Application |
|-------|-------------------|--------------------|----------|------------------------------|
| 2 | 8 unnamed workers | Ramada Inn - Destin | Housekeeper | December 11, 2003 |
| 3 | 88 unnamed workers | Hilton Sandestin Beach Golf Resort & Spa | Housekeeper | December 11, 2003 |
| 4 | 32 unnamed workers | Hilton Sandestin Beach Golf Resort & Spa | Housekeeper | December 11, 2003 |
| 5 | 95 unnamed workers | Embassy Suites Hotel, Destin - Miramar Beach | Housekeeper | October 14, 2004 |
| 6 | 110 unnamed workers | Bay Point Marriott Resort, Golf and Yacht Club | Housekeeper | October 14, 2004 |

All in violation of Title 18 United States Code, Sections 1546(a) and 2.

16

## COUNTS SEVEN THROUGH ELEVEN

The allegations contained in Count One, Sections A, C and D of this Indictment

are hereby realleged and incorporated by reference herein.

That on or about the dates listed below, in the Northern District of Florida and

elsewhere, the defendants,

**ALEKSANDER V. BERMAN,**
**a/k/a "Alex Berman,"**
**JUSTIN KING,**
**and**
**VYACHESLAVE ADOL'FOVICH FINKEL,**
**a/k/a "Stan Finkel,"**
**a/k/a "Slava Finkel,"**

did knowingly make under oath, and as permitted under penalty of perjury under Title 28,

United States Code, Section 1746, and did knowingly subscribe as true, false statements

with respect to a material fact in applications, affidavits and other documents required by

the immigration laws and regulations prescribed thereunder, and did knowingly present

such applications, affidavit and other documents containing false statements, that is:

| Count | Alien Beneficiary | Purported Employer | Position | Date of ETA-750 Application |
|-------|-------------------|--------------------|----------|-----------------------------|
| 7 | 70 unnamed workers | Four Points Sheraton | Housekeeper | July 10, 2006 |
| 8 | 85 unnamed workers | Seascape Resort | Housekeeper | July 27, 2006 |
| 9 | 90 unnamed workers | Seascape Resort | Housekeeper | February 20, 2007 |
| 10 | 90 unnamed workers | Embassy Suites | Housekeeper | February 20, 2007 |

17

| Count | Alien Beneficiary | Purported Employer | Position | Date of ETA-750 Application |
|-------|-------------------|--------------------|----------|------------------------------|
| 11 | 50 unnamed workers | Four Points Sheraton | Housekeeper | February 21, 2007 |

All in violation of Title 18, United States Code, Sections 1546(a) and 2.

## COUNT TWELVE

The allegations contained in Count One, Sections A, C and D of this Indictment

are hereby realleged and incorporated by reference herein.

That from on or about April 22, 2002, through the date of the return of this

Indictment, in the Northern District of Florida and elsewhere, the defendants,

**ALEKSANDER BERMAN,**
**a/k/a "Alex Berman,"**
**JUSTIN ERIC KING,**
**and**
**VYACHESLAVE ADOL'FOVICH FINKEL,**
**a/k/a "Stan Finkel,"**
**a/k/a "Slava Finkel,"**

did knowingly combine, conspire, confederate and agree with other persons known and

unknown, for the purpose of commercial advantage and private financial gain, to

encourage and to induce aliens to come to, enter and reside in the United States, knowing

and in reckless disregard of the fact that such coming to, entry and residence was and

would be in violation of law.

All in violation of Title 8, United States Code, Sections 1324(a)(1)(A)(iv),

(a)(1)(A)(v)(I) and (a)(1)(B)(i).

18

A TRUE BILL

FOREPERSON

9/18/2007
DATE

GREGORY R. MILLER
United States Attorney

TIFFANY H. EGGERS
Assistant United States Attorney

ARLENE REIDY
Trial Attorney Domestic Security Section
United States Department of Justice

19